You're back. Yes, Your Honor. Good morning. Robert Ellman again. May it please the Court. This is a mortgage fraud case in which the United States sought a million-dollar criminal forfeiture money judgment, and the Court imposed a $100 judgment. And, of course, the government is assigning error to the Court's refusal to issue the $1 million amount. That amount is, again, the amount that the defendant actually stipulated to in the plea memorandum. This case provides, unfortunately, a much thinner record of what Judge Mahan's rationale actually was. The only time he addressed it was at sentencing just immediately prior to refusing to enter the judgment, where he said he was not inclined to issue the requested money judgment because Mr. Tedesco was not a ringleader or mastermind of the mortgage fraud conspiracy. And, again, that is simply not a ground that any court recognizes as an exception. Sotomayor If we were to agree with you on the generic legal principle, what would be the result? And let me be more specific. Would the defendant be bound by paragraph G1 of the plea agreement to the amount of $1 million, or would the court still have to find the amount of, quote-unquote, proceeds up to $1 million? The paragraph in the plea agreement remains effective, and no further finding is necessary, Your Honor, and these are the reasons. Which paragraph is that? I'm trying to find it. It's G1. It's page 69 of the excerpts of record, around lines 9 through 11 of that page. I thought that the district court also said that he was convinced that the loss to the financial institution from the transaction at issue was less than $1 million. That's correct, and it is, Your Honor. The loss amount is, I believe, $298,000. So why wouldn't that be the proceeds? Because that's the net loss to the victim. The proceeds is the amount of money generated by the criminal activity. So it's the amount of money that the fraud induced the bank to release. And that was $1 million? I don't know what that amount actually is, Your Honor. The PSR describes a conspiracy that went on for three and a half years, and the specific transaction that's referenced in the plea memo is only one overt act in that conspiracy. There was no – there is no evidence in the record of a million dollar – of a million dollars in proceeds because the amount was undisputed. If the amount's disputed under Rule 32.2, then the parties can demand an evidentiary hearing. But that – Can you explain to me the difference between proceeds and loss? Yes, Your Honor. Proceeds is what the defendants obtained through their criminal activity, the amount they robbed from a bank or the amount that a lender gives them if they induce the loan by fraud. So in this case, the proceeds would be – this is not a bank robbery case. This is a loan fraud case. So this is how much they got by way of loans. And the loss – and some of it got paid back? Yes, on this transaction. $298,000 was the amount that the lender didn't get back. That's why that's the loss. And how did the bank get back the difference? There was a foreclosure. And that's the amount that was recovered, as I understand it, after the foreclosure sale. So there was collateral on the transaction. Correct. And the – the deficiency, that's what I was looking for. That's right, Your Honor. The deficiency was what you are now claiming, what is the loss to the bank, right? That's right, Your Honor. Now, I'm just conceptualizing. Why is the amount that they get, the amount of cash, if they put up collateral, which is then good for part of it? I – it's one thing to sort of get the money free and clear and you walk off with it like a bank robber. I realize it's not a robbery case, but, you know, there are frauds where somebody hands you the cash and you, you know, swindle somebody, gets the cash, walks away with it, there's no collateral. And the, you know, what's the nexus of the value of the collateral? That's what the victim gets. There is an offset there, and that's why the restitution amount is different from the forfeiture amount, because the forfeiture amount is supposed to reflect a punishment, and actually forfeitures I understand all that theory, but I'm saying as far as the proceeds of the transaction, if you are – why isn't – if you give up the property, essentially it's a sale of part of the property, because once you put a loan on it, once you put a lien on it, you've given up title, it's – the land is not going to walk away. I mean, I realize profit doesn't walk away, but money walks away, gold can walk away, land doesn't walk away, so it's there available to be foreclosed. So why isn't the proceeds that you get from a transaction of that, the net of the loan amount minus the value of the collateral? Well, Your Honor, the answer is because the law treats those amounts separately. What you're describing in terms of the amount of the loan protected by the collateral does matter when it comes to restitution, and the restitution amount is offset exactly the way that you're contemplating. But that's not the goal or the process when it comes to forfeiture under the statute. The United States takes right title and interest at the moment the crime occurs for the full amount of the proceeds. I have a different question about proceeds, because – and now I'm looking at Excerpts page 67 under the Sentencing Guideline calculation, starting at line 13, so you don't get lost from what I'm concerned about. There's a paragraph, too, that says that the parties agree that the readily provable amount of relevant conduct – and I'm going to skip some words – is more than $400,000, but less than a million dollars. Would the amount of relevant conduct, which is based on, I think, a broader concept of loss than restitution, be equivalent to what the proceeds should be? And if so, then why doesn't the district court have to figure out where the right amount lies between $400,000 and a million? Well, apart from the defendant's stipulation to that amount further on in the plea agreement, which you've already referenced, Your Honor. Well, this is arguably, you know, in contradiction to that, if the court's job is actually to figure out what the proceeds were. That's true, Your Honor. And if Judge Mahan had found the million-dollar amount problematic, or if the defendant had challenged it notwithstanding the stipulation in the plea memorandum, then there would have been a hearing. But the reason there was no hearing is because that amount was never in dispute, notwithstanding the loss amount set forth. Doesn't the court have an independent obligation in this context to figure out what is the proper amount of proceeds? Well, if it's problematic, I would agree, Your Honor, but Rule 32.2 says that the court can rely on the plea memorandum, among other things. Well, it can, but I guess to me this is internally, potentially internally inconsistent. But that's what you're referring to for offense level is loss amount, though, which, again, is distinct from proceeds. Proceeds. So those two numbers can be different. How would the proceeds be different than the loss amount? You have a loan of a million dollars, which is collateralized by a piece of property. The loan's induced by fraud, so the proceeds is the face amount of the loan. The loss amount is the amount of the loan less what the lender recovers after the foreclosure proceedings have concluded, because that property doesn't become valueless. It is collateralized. It's simply not collateralized in the full amount of the loan because of the fraud. So in your view, when looking at the relevant conduct, you don't look at the total face amount of the loan? But you look at the amount of loss. Well, it is. And, again, that's from the overt act here, but this is a much broader conspiracy. No, I know that. But this ostensibly covers the whole conspiracy, the plea agreement. As I understand it, it's meant to cover the whole thing, but. I'm embarrassed to say I can't tell you whether it is or not, Your Honor. I don't know the answer to that question. I need to study up more. I apologize for that, Your Honor. I see my time is up. Okay. We'll hear from the defendant. Good morning, Your Honors. I'm Jacqueline Naylor. I was appointed to represent John Tedesco in this case. Well, Your Honor, let me tell you a little about the facts. Mr. Tedesco did, in fact, agree to this amount in the plea memo. He was contacted by a case agent and immediately he was told they had certain evidence about him. Would he talk to them? He immediately said yes, and he immediately agreed to cooperate with the government. I was appointed several months later to represent him, and at that time he had worked out the plea negotiations. I got the discovery in the case. I met with him. I spent several hours going through it, talking about the plea memo. As is my practice, I told him he wasn't signing anything, and he sent him home. About a week later, he called and said he'd thought it through. He wanted to sign it, and it came down, and he was very adamant. He is an extremely religious man who felt very, very bad about this. He's going to be 68 years old next week, never been in trouble in his life. High school education, supported a family through teaching himself the graphic arts, and he was mortified at what he's done. He insisted that he would sign this and he would cooperate with the government in any way he could. So there's no question as the case reaches us, even without his personal sincerity involved, that the plea agreement is binding. It's a binding document. I have no case law to say otherwise, Your Honor. He went in and did it voluntarily. So what is the effect, in your view, of the fact that he expressly agreed to a forfeiture amount of $1 million? I have to be candid, Your Honor. He – the case agent told him, we know you don't have it. You'll never have to pay it. He will never have it. The assistant U.S. attorney at the time, Mr. Tao, told me, you know, we know he will never have it. I don't see how it's not binding. Did he ever have it? No, Your Honor. He never – in fact, he never really received much of anything in this case. He was a minor player. He worked for a man named Brad Tobin, or Toobin, I believe, T-u-b-i-n. And he – I was never – there was never any amount established. There was no evidence in the record he ever got the $298,000 that he agreed to forfeiture. There was no evidence that he received anything beyond a very, very small hourly salary. The question, then, is why did he do this? And I don't know. And also, why did you sign it? Your name is on the plea agreement, isn't it? I signed it, Your Honor, because Mr. Tedesco was adamant. I mean, I could have moved to withdraw, I guess, but, you know, I felt that getting the evidence, going through the evidence, literally spending hours with my client, saying, you're not signing anything today, you think about it, you come back. And at his insistence, you know, I guess I could have moved to withdraw, but that's what he wanted to do. He knew he would – This was a wide-ranging conspiracy, as it was alleged. And so I guess it's not unheard of that it could have proceeds of a million dollars. He believed that that was possible. He was certainly not the only co-conspirator, Your Honor. And as Mr. Ellman said, it had gone on over a period of time. And he felt that conceivably it could have brought in to Mr. Toobin and others up to a million dollars. May I say something for the record regarding my client, Your Honor? Sure. I do feel that it is in his best interest, as he is a very religious man who feels terrible about what he did and doesn't really have a reason for that. He's searching his own soul. But I'd like to address some of the comments made about Mr. Tedesco by the counsel for Elena Woodard in Case No. 10-10395. Could you move over just a tiny bit so you're speaking directly into the mic? Yes. These comments were made in his emergency motion to deconsolidate the argument of these cases. And because of some of the allegations that he leveled in his motion, I think I have a good idea of some of the things he may say to you in the next argument. And for the record, Mr. Tedesco is not a dangerous man. He would not and will not and did not ever threaten Ms. Woodard. This is just nonsense. As I said, he's going to be 68 next week. He's a quiet man. He's very religious. He's been married for 45 years to the same woman, has two grown children. When I first accepted appointment on this case, the assistant U.S. attorney, Jeff Tao, told me that the first time Mr. Tedesco was called, he immediately admitted his guilt. He immediately agreed to cooperate in this case. As I've been through the facts regarding the plea memorandum, why he insisted on signing them, it was a matter of conscience. And even though it's very commendable that Ms. Woodard provided cooperation against Mr. Tedesco, that was never needed because Mr. Tedesco provided cooperation against Mr. Tedesco. The lack of familiarity with Mr. Tedesco on the part of Ms. Woodard's counsel is illustrated by his comment on page 3 of his motion that he assumes Mr. Tedesco did not cooperate. In fact, he did from the onset. Also at line 8 on page 3, he said Ms. Woodard has legitimate safety concerns regarding Ms. Tedesco. This simply is not true. In fact, Mr. Tedesco entered his plea much before Ms. Woodard. Ms. Woodard hadn't even entered her plea at the time that Mr. Tedesco's pre-sentence report was prepared. So I did want to put that on the record. Thank you. Thank you. Let me just ask one question before you step down. Yes, Your Honor. What would be your suggested outcome of this case? You know the case law that's against you. It is, Your Honor. But, you know, some of the cases, I think it's rather confusing, but some of the cases do talk about the proceeds that that individual received, even in the Casey case where it involved $7,000. That whole $7,000 ran through Mr. Casey's hands. But even if we were to reverse, we would, and again I'm speaking just for myself, there's a possibility that we would remand, and at that point Judge Mahan would have to determine what are the, quote, "'proceeds'," unquote, with respect to this individual. Now, that hasn't been done yet, has it? No, it hasn't, Your Honor. And that would probably be the best case scenario for Mr. Tedesco, because there has been no evidence in the record so far of the proceeds, anything that he actually possessed. Now, obviously, with conspiracy and joint and several liabilities. That's just what I was going to ask you. Isn't it, in that scenario, wouldn't it be sufficient for the government to demonstrate that the conspiracy as a whole had proceeds of a million dollars or more? Wouldn't that suffice even if it never went individually through your client's hands? I don't have case law to dispute that, Your Honor. Okay. Thank you very much. Thank you. Thank you. You're out of time, and I'm not sure there's much to add in any event, so we'll order this case submitted. I was speaking to Mr. Allman for the government. We will now clear the courtroom for the last case on the calendar where we've been asked. Apparently, there are matters that are confidential. May I ask, is it still being streamed? Because my law clerk can't hear me. I believe the streaming is going to go. Continue. No, it's going to stop. It's going to stop. Will there be a tape that my clerk can listen to, then?  He's not here. Okay. I'll need one of those sent as soon as possible to Portland. The last case was streamed, yes? Right, so they were able to hear the last two arguments. The previous case, the desk case, was streamed. Well, anything that wasn't, I need in tape form. Thank you. Okay, and so let's make sure we identify who's in the courtroom. Just for the record, of course, the panel of judges is present. We have our deputy clerk at the clerk's station. We have a court security officer in the courtroom at the door. Those are my two law clerks.
judges: Kozinski, O'scannlain, Graber